UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RICK BABCOCK,

                                        Plaintiff,

              -against-

NEW YORK STATE OFFICE OF MENTAL
HEALTH, MID-HUDSON FORENSIC
PSYCHIATRIC CENTER, and HOWARD
HOLANCHOCK, Director of Mid-Hudson Forensic
Psychiatric Center, in his individual and professional
capacities,

                                        Defendants.

04 Civ. 2261 (PGG)

**MEMORANDUM
OPINION AND ORDER**

PAUL G. GARDEPHE, U.S.D.J.:

              In this action, Plaintiff Rick Babcock alleges that Defendants New York State

Office of Mental Health ("OMH") and Mid-Hudson Forensic Psychiatric Center ("Mid-

Hudson") subjected him to disparate treatment and a hostile work environment because of his

gender, and retaliated against him for complaining about this discrimination, all in violation of

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.  (First Amended

Complaint ("Cmplt."), First, Second, Third Causes of Action).  Babcock also alleges that OMH,

Mid-Hudson, and Howard Holanchock,[1] the Executive Director of Mid-Hudson, discriminated

against him on the basis of his gender and age, and retaliated against him for his opposition to

these discriminatory practices, in violation of the New York State Human Rights Law

("NYSHRL"), New York Executive Law § 296 et seq.  (Id., Fifth Cause of Action).[2]  Defendants

---

[1]  The First Amended Complaint erroneously names Defendant Holanchock as "Holenchuk."

[2]  The First Amended Complaint contains no Fourth Cause of Action.

have moved for summary judgment on all of Babcock's claims.  For the following reasons,

Defendants' motion (Docket No. 39) is GRANTED.[3]

## DISCUSSION

## I.   SUMMARY JUDGMENT STANDARD

Summary judgment is warranted only if the moving party shows that "there is no

genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c).  "A dispute about a 'genuine issue' exists for summary judgment purposes

where the evidence is such that a reasonable jury could decide in the non-movant's favor."

Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  In deciding a summary judgment

motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could

rationally be drawn, in favor of the party opposing summary judgment."  Cifra v. Gen. Elec. Co.,

252 F.3d 205, 216 (2d Cir. 2001).

"It is now beyond cavil that summary judgment may be appropriate even in the

fact-intensive context of discrimination cases," and that "the salutary purposes of summary

judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination

cases than to . . . other areas of litigation."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456,

---

[3]  Although Babcock's NYSHRL claim asserts age discrimination, and the first paragraph of the
First Amended Complaint alludes to the Age Discrimination in Employment Act, in his
memorandum of law opposing summary judgment and in his Rule 56.1 Statement, Babcock does
not present any facts or legal argument concerning alleged age discrimination.  Accordingly,
Babcock has abandoned any claim based on age discrimination and any such claim will be
dismissed.  See Grana v. Potter, No. 06 Civ. 1173 (JFB)(ARL), 2009 WL 425913, at *15
(E.D.N.Y. Feb. 19, 2009) (considering claim abandoned because plaintiff's summary judgment
opposition "contained no factual or legal discussion" of the claim); Bronx Chrysler Plymouth,
Inc. v. Chrysler Corp., 212 F. Supp. 2d 233, 249 (S.D.N.Y. 2002) (dismissing claim as
abandoned because party opposing summary judgment "made no argument in support of th[e]
claim at all" in its summary judgment opposition papers); Douglas v. Victor Capital Group, 21 F.
Supp. 2d 379, 393 (S.D.N.Y. 1998) (dismissing as abandoned claims that defendants addressed
in motion for summary judgment but plaintiff failed to address in his opposition papers).

466 (2d Cir. 2001) (internal quotation omitted).  As in any other case, "an employment

discrimination plaintiff faced with a properly supported summary judgment motion must 'do

more than simply show that there is some metaphysical doubt as to the material facts.'  . . .  [He]

must come forth with evidence sufficient to allow a reasonable jury to find in [his] favor."

Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

       "Mere conclusory statements, conjecture or speculation" by the plaintiff will not

defeat summary judgment.  Gross v. National Broad. Co., Inc., 232 F. Supp. 2d 58, 67 (S.D.N.Y.

2002); see also Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) ("Even in the

discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a

motion for summary judgment.").  Instead, the plaintiff must offer "concrete particulars."

Bickerstaff v. Vassar Coll., 196 F.3d 435, 451–52 (2d Cir. 1999) (disregarding plaintiff's Rule

56(e) affidavit because it lacked "concrete particulars"); Meiri v. Dacon, 759 F.2d 989, 998 (2d

Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely

conclusory allegations of discrimination, absent any concrete particulars, would necessitate a

trial in all Title VII cases.").

       The Court is mindful that "direct evidence of . . . [discriminatory] intent will only

rarely be available, so . . . 'affidavits and depositions must be carefully scrutinized for

circumstantial proof which, if believed, would show discrimination.'"  Holcomb, 521 F.3d at 137

(internal citation omitted) ("We have repeatedly expressed the need for caution about granting

summary judgment to an employer in a discrimination case where, as here, the merits turn on a

dispute as to the employer's intent.").  However, the Court must also "carefully distinguish

between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." Bickerstaff, 196 F.3d at 448.

As is routine in this Circuit, the Court will treat Babcock's claims under Title VII and the NYSHRL "as analytically identical, applying the same standard of proof to both claims," except with respect to the question of whether any claims are time-barred. Salamon v. Our Lady of Victory Hosp., 514 F.3d 217, 226 n.9 (2d Cir. 2008) (considering sex discrimination claims); see also Schiano v. Quality Payroll Sys., 445 F.3d 597, 609 (2d Cir. 2006) (hostile work environment and retaliation claims are generally governed by same standards under federal and New York state law).

## II.   THE PARTIES

Defendant OMH is New York State's lead agency responsible for statewide oversight of public mental health services.[4]  (Defs. R. 56.1 Stat. ¶ 1)  OMH also provides inpatient and outpatient services to individuals with long-term mental illness.  (Id. ¶ 2)  In this capacity, Defendant OMH operates Defendant Mid-Hudson, which is a secure adult psychiatric center that provides a comprehensive program of evaluation, treatment, and rehabilitation for patients with mental illness.  (Id. ¶¶ 3–4)  As Mid-Hudson's Executive Director, Defendant

---

[4]  Babcock has not submitted a response to Defendants' Rule 56.1 Statement that sets forth a "correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party."  Accordingly, under Local Rule 56.1(c), the provisions of Defendants' Rule 56.1 Statement are "deemed to be admitted for purposes of this motion."  Nonetheless, while this Court "'is not required to consider what the parties fail to point out' in their Local Rule 56.1 statements, it may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement."  Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) (citation omitted).  Here, to the extent that Babcock's affidavit, Rule 56.1 Statement, and other submissions cite admissible evidence that appears to controvert Defendants' Rule 56.1 Statement, this Court relies on Plaintiff's characterization of the evidence.  See Cifra, 252 F.3d at 216 (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

Holanchock has supervisory authority over the institution's 575-member staff, which includes approximately 280 Security Hospital Treatment Assistants ("SHTAs").  (Id. ¶¶ 9–10, 21)

From 1999 through at least November 2006, Plaintiff Babcock has been employed as an SHTA at Mid-Hudson.  (Babcock Aff., ¶¶ 2-3)  As an SHTA, Babcock's responsibilities include:  supervising and assisting patients with activities of daily living; establishing and maintaining count of patients; exchanging pertinent information on ward management and patient care issues with nurses and SHTA staff; conducting patient room checks; maintaining order and minimizing patient injuries; escorting patients within the facility and to and from outside destinations; and assisting in implementing treatment plans.  (Defs. R. 56.1 Stat. ¶¶ 22–23)

## III.   BABCOCK'S DISPARATE TREATMENT CLAIMS

The First Amended Complaint alleges that, from March 2003 through August 18, 2005, Defendants discriminated against Babcock by denying him opportunities for promotional advancement and overtime.  (Cmplt. ¶ 23)  More specifically, Babcock claims that Defendants denied Babcock such opportunities by:

> (1) engaging – with respect to Ward 21/22, which houses only female patients – in patterns and practices of  "assigning only female SHTAs," "holding female SHTAs over for overtime opportunities and . . . send[ing] male SHTAs home," and generally denying male SHTAs assignments to that ward (Cmplt. ¶¶ 23–25, 27A);[5]
>
> (2) "routinely assigning [P]laintiff and other male SHTAs to wards with assaultive male patients and giving one-to-one and two-to-one assignments with female patients with documented histories of being combative and aggressive to male SHTAs only" (Id. ¶¶ 28–29);

---

[5]  Given that the First Amended Complaint contains two paragraphs that are both numbered "27," this Court refers to the first such paragraph as "¶ 27" and the second such paragraph as "¶ 27A."

(3) continually filling vacant bid positions at Mid-Hudson with "newly hired female SHTAs instead of first putting the bids out to permanent employees to bid upon based upon rank and seniority" (Id. ¶ 27); and

(4) "failing to approve plaintiff's applications for enrollment in defendants' nursing program" on "several occasions," while on each occasion selecting female SHTAs, "the majority under the age of 40 years."  (Id. ¶¶ 30–34; Pltf. Br. 6–14).

## A.    <u>Applicable Law</u>

The framework for analyzing Title VII cases is well established:

[Under] the familiar "burden-shifting" framework set forth for Title VII cases by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973) and <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981), . . . the plaintiff bears the initial burden of establishing a prima facie case of discrimination. If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, non-discriminatory reason" for its action.  If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of . . . discrimination.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

<u>Holcomb</u>, 521 F.3d at 138 (citations omitted).

Here, Defendants argue that Babcock's disparate treatment claims should be dismissed because he has not established a prima facie case of discrimination.  The plaintiff's burden in establishing a prima facie case "'is not onerous'" – indeed, it is "<u>de minimis</u>," <u>Beyer</u>, 524 F.3d at 163 – and is satisfied by "'evidence that raises a reasonable inference that the action taken by an employer was based on an impermissible factor.'"  <u>Holcomb</u>, 521 F.3d at 138 (quoting <u>Burdine</u>, 450 U.S. at 253).  While a low standard applies to the prima facie case determination, "a plaintiff's case must fail if [he] cannot carry this preliminary burden."  <u>Beyer</u>, 524 F.3d at 163.

To establish a prima facie case of gender discrimination, Babcock must show: "(1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Holcomb, 521 F.3d at 138. Defendants assert that Babcock cannot establish the third and fourth elements of this test, and that even if a prima facie case of discrimination had been demonstrated, Defendants have articulated legitimate, non-discriminatory reasons for their actions, which Babcock has not rebutted. (Defs. Br. at 7–18)

To satisfy the third element of this test – showing that he suffered an adverse employment action – Babcock must offer evidence from which a jury could find that the complained-of act "'created a materially significant disadvantage' in . . . [his] working conditions." Beyer, 524 F.3d at 164 (quoting Williams v. R.H. Donnelley Corp., 368 F.3d 123, 128 (2d Cir. 2004)). Where the complained-of action causes "mere inconvenience," it does not constitute an adverse employment action. Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) ("[t]o be materially adverse, . . . [the] change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities'"). Moreover, Babcock must "proffer objective indicia of material disadvantage." Beyer, 524 F.3d at 164. He cannot show that he suffered an adverse employment action merely by pointing to his "subjective, personal disappointment[]." Id. (internal quotation omitted).

To establish the fourth element of his prima facie case, Babcock must show that any adverse employment action occurred in circumstances giving rise to an inference of discrimination. A plaintiff may do so by "showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group.'" Mandell v. County

of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003).  To raise an inference of discrimination, Babcock

must "'show [that he] was similarly situated in all material respects to the individuals with whom

[he] seeks to compare [him]self.'"  Id. (internal quotation omitted).

        "Ordinarily, the question whether two employees are similarly situated is a

question of fact for the jury."  Id.  "This rule is not absolute, however, and a court can properly

grant summary judgment where it is clear that no reasonable jury could find the similarly

situated prong met."  Harlen Assocs. v. Incorporated Vill. of Mineola, 273 F.3d 494, 499 n.2 (2d

Cir. 2001).  To prevail, the plaintiff must at least "provide 'an objectively identifiable basis for

comparability' between h[im]self and other employees."  Goldman v. Admin. for Children's

Serv., No. 04 Civ. 7890 (GEL), 2007 WL 1552397, at *7 (S.D.N.Y. May 29, 2007) (citation

omitted).  Conclusory statements that "similarly situated" employees outside the protected class

were treated more favorably are not sufficient to defeat summary judgment.  See, e.g., id. at **7–

8; Chan v. NYU Downtown Hosp., No. 03 Civ. 3003 (RMB), 2006 WL 345853, at **5–6

(S.D.N.Y. Feb. 14, 2006) (plaintiff's conclusory statements that Caucasian employees were

treated differently were insufficient to make out prima facie case of race discrimination because

plaintiff did not "identify any similarly situated individuals outside her protected class who were

treated preferentially"); Abato v. New York City Off-Track Betting Corp., No. 03 Civ. 5849

(LTS), 2007 WL 1659197, at *6 (S.D.N.Y. June 7, 2007) (conclusory statements that "similarly

situated younger women" were treated differently, in the absence of any "specific information"

concerning those individuals, were "insufficient to present a genuine issue of material fact").

        With respect to his first three disparate treatment claims, Babcock has offered no

evidence that he suffered an adverse employment action, much less that such an action arose in

circumstances giving rise to an inference of discrimination.  Moreover, even if a reasonable jury

could find that Babcock established a prima facie case of gender discrimination with respect to his first and third disparate treatment claim – thereby shifting the burden of production to the employer – Defendants have articulated "legitimate, non-discriminatory reason[s]" for their actions, which Babcock has not rebutted.[6]  See McDonnell-Douglas Corp., 411 U.S. at 802. Finally, with respect to Babcock's fourth disparate treatment claim – which concerns Defendants' delay in admitting him to the nursing grant program – Babcock has not established a prima facie case of gender-based discrimination because he has not shown that he he was similarly situated in all material respects to the female candidates who gained admission to the program before him.  Even if Babcock had established a prima facie case with respect to his fourth disparate treatment claim, he has not rebutted the legitimate, non-discriminatory reasons that Defendants have articulated for their actions.  Accordingly, Defendants are entitled to summary judgment on Babcock's disparate treatment claims.

      **B.**      **The Ward Assignment Claims**

            **1.**      **Assignment of SHTAs to Ward 21/22, the All-Female Ward**

      Babcock alleges that Ward 21/22 at Mid-Hudson "houses only female patients," who "[t]raditionally . . . require more staffing and thus, Ward 21[/]22 creates more opportunities for overtime."  (Cmplt. ¶ 24)  With respect to Ward 21/22, Babcock's claims fall into two time periods:  (1) March 2003 through August 2004; and (2) August 2004 through August 18, 2005. During the former period, the Complaint alleges that Defendants "engaged in a pattern and practice of assigning only female SHTAs to Ward 21[/]22," "refused to permit assignments of any male SHTA to Ward 21[/]22," and "engaged in a pattern and practice of holding female SHTAs over for overtime opportunities and would send male SHTAs home."  (Id. ¶ 25)  During

---

[6]  As to Babcock's second disparate treatment claim – in which he alleges that Defendants assigned only male SHTAs to assaultive patients – Defendants, as explained below, have offered unrebutted evidence that they have no such policy.

the latter period, Babcock alleges that Defendants engaged in a practice of permitting only one

male SHTA to be assigned to Ward 21/22.  (Id. ¶ 27A)  Because this practice allegedly "varie[d]

with regard to each shift" and because "at no time [were] male SHTAs assigned to Ward 21[/]22

for each of the three tour shifts of duty," Babcock asserts that he "continue[d] to be denied

overtime and promotional opportunities."  (Id.)

        Babcock has not demonstrated, however, that he suffered an adverse employment

action with respect to the all-female ward.  First, Babcock has offered no evidence that he was

denied overtime and promotional opportunities with respect to Ward 21/22.  Indeed, Babcock's

Rule 56.1 Statement does not even mention the all-female ward.  Second, the undisputed record

reveals that Babcock received an extraordinarily high amount of overtime compensation during

the relevant time periods.  From April 3, 2003 through March 31, 2004, he was paid $40,990 for

1,385.50 overtime hours, and between September 16, 2004 and September 14, 2005, he was paid

$53,936 for 1,703.75 overtime hours.  Babcock was the fourth highest overtime earner among

Mid-Hudson's 575-member staff.  (Defs. R. 56.1 Stat. ¶¶ 40–41).  Finally, Babcock's testimony

confirms that he worked an "abundance of overtime," that he had a reputation as "not just an

overtimer, [but] an overtime killer," and that "there's only one other person at my facility that

does more overtime. . . ."  (Babcock Dep. 141:8-9, 144:24-25, 145:9-10; see Defs. R. 56.1 Stat. ¶

38)  Accordingly, Babcock has failed to "proffer objective indicia of material disadvantage,"

Beyer, 524 F.3d at 164, and has likewise not addressed the substantial and undisputed record

evidence demonstrating that he had more overtime opportunities than almost all other Mid-

Hudson employees during the relevant period.

        The record also establishes – contrary to Babcock's claims – that Mid-Hudson

does not require that only female SHTAs are assigned to female patients, but rather only requires

that at least one SHTA who is of the same gender be assigned to patients on each ward.  (Defs.
R. 56.1 Stat. ¶¶ 31-32; Berridge Decl., Ex. G)  The purpose of this requirement is to provide
patients with "intimate personal care" (id. ¶ 31), and this Court has previously held that this
policy satisfies the "bona fide occupational qualification" exception to Title VII, because it
"strikes a balance between the patients' privacy interests and the right of SHTAs to bid for a
position."  Jennings v. New York State Office of Mental Health, 786 F. Supp. 376,
387 (S.D.N.Y. 1992) ("Thus, we find that the requirement that at least one SHTA of the same
gender as the patients be assigned to the ward is permissible under Title VII.").

       With respect to assignments of voluntary overtime, it is also undisputed that Mid-
Hudson assigns SHTAs in the sequence that they appear on a computer-generated list that ranks
SHTAs according to hours worked and seniority; the employee generating the list cannot control
this sequence, which is determined by computer software.  (Defs. R. 56.1 Stat. ¶ 34)  Upon
selecting SHTAs for voluntary overtime, Mid-Hudson places them where they are needed in the
facility.  (Id.)  If there is a need for additional overtime workers after the voluntary list is
exhausted, the same computer software generates a mandatory overtime list that ranks SHTAs
according to mandatory overtime shifts previously worked and seniority.  (Id. ¶¶ 35–36)

       In sum, Defendants are entitled to summary judgment with respect to the all-
female ward claim because Babcock has offered no evidence that he suffered an adverse
employment action.  Even if Babcock had established a prima facie case of discrimination with
respect to Mid-Hudson's policy of assigning at least one SHTA of the same gender to patients in
each ward, Babcock has not rebutted Defendants' legitimate non-discriminatory rationale for this
policy – namely, Mid-Hudson's patients' privacy interests.

### 2.   Alleged Assignment of Male SHTAs to Aggressive Patients

The First Amended Complaint also alleges that Defendants discriminated against Babcock based on his gender by "routinely assigning [him] and other male SHTAs to wards with assaultive male patients, and giving one-to-one and two-to-one assignments with female patients with documented histories of being combative and aggressive to male SHTAs only."[7]  (Cmplt. ¶ 28)  As a result, Babcock contends that he and other male SHTAs "have been physically injured while performing their duties.  (Id. ¶ 29)  He further alleges that "Defendants have a pattern and practice of not assigning similarly situated female SHTAs to wards with aggressive or assaultive male patients" and instead assign them "to wards or individual female patients who are not aggressive or assaultive."  (Id.)

Once again, Babcock has not addressed this claim in his Rule 56.1 Statement, in his memorandum of law, or in his other submissions, while the Defendants have offered undisputed evidence that they have no such policy.  (Defs. R. 56.1 Stat. ¶¶ 84-86)  Because Babcock has neither offered evidence in support of the First Amended Complaint's allegations nor rebutted Defendants' evidence showing that there was no adverse employment action in this regard, Defendants are entitled to summary judgment on this claim.

### C.   Alleged Failure to Follow Bid Process Concerning Vacant Positions

Babcock alleges that between March 2003 and August 18, 2005, he and all other male SHTAs were denied opportunities for overtime and promotional advancement because Defendants "continually fill[ed] vacant bid positions within the facility, including positions on Ward 21[/]22, with newly hired female SHTAs instead of first putting the bids out to permanent employees to bid upon based upon rank and seniority."  (Cmplt. ¶ 27)  In moving for summary

---

[7]  A "one-to-one" or "two-to-one" assignment refers to the monitoring of a patient on a full-time basis by one or two SHTAs.  (Defs. R. 56.1 Stat. ¶ 82)  Such monitoring occurs for a variety of reasons, including that a patient poses a danger to himself or herself, or to others.  (Id. ¶ 83)

judgment, Defendants contend that Babcock mischaracterizes the bidding process, that the bids do not relate to promotions, and that the New York State Department of Civil Service chiefly determines the candidates for promotion.  (Defs. Br. 10–12)

Babcock's disparate treatment claims based on Defendants' handling of the bid process will be dismissed.  Babcock has offered no evidence in support of this claim and has in no way rebutted Defendants' evidence showing that bids have no bearing on promotions of SHTAs.[8]  (Defs. R. 56.1 Stat. ¶ 43)  The State Civil Service Department's policies, and not Mid-Hudson's bidding process, determine SHTA promotions.  When a Senior SHTA position becomes available, Mid-Hudson notifies OMH's Centralized Unit, which then contacts the New York State Department of Civil Service ("DCS") to obtain a list of candidates.  (Defs. R. 56.1 Stat. ¶ 45)  DCS forwards to the Centralized Unit a list of candidates who have taken the required Civil Service Exam, are designated as active, and have expressed interest in the geographic area in which Mid-Hudson is located.  (Id. ¶ 46)  OMH's Centralized Unit then sends out "canvass" letters to candidates, who must state an interest in the position within fifteen days.  After receiving responses to the canvass letters, the Centralized Unit sends Mid-Hudson a list of acceptors.  (Id.)  With respect to this list, Civil Service regulations permit Mid-Hudson to consider for promotion the candidates who received the highest Civil Service Exam score; Mid-Hudson may consider candidates with lower scores only when there are fewer than three candidates with the highest score.  (Id. ¶ 47)  Neither OMH's Centralized Unit nor Mid-Hudson have any control over which employees are on the Civil Service List.  (Id. ¶ 48)

---

[8]  Under the union contract, the bidding process permits SHTAs only to submit bids for a particular Mid-Hudson building, not for a particular ward.  Mid-Hudson then awards bids for building assignments based on the seniority of the SHTAs who have applied.  (Defs. R. 56.1 Stat. ¶¶ 24, 42)  Moreover, even if Babcock had bid for and obtained a placement in Building 2, where female patients reside, it would have had no effect on his job title or pay rate.  (Babcock Dep. 463:5-17)

Moreover, even if Babcock's failure to obtain a promotion to Senior SHTA was attributable to Defendants, the circumstances regarding SHTA promotions do not give rise to an inference of discriminatory intent.  It is undisputed that between March 2003 and August 2005, all six Mid-Hudson employees who were promoted from SHTA to Senior SHTA were men.  (Id. ¶ 49)  With respect to the civil service lists generated for these six Senior SHTA vacancies, Babcock's name appeared on only the most recent list dated June 6, 2005, which Mid-Hudson used to award a promotion on August 4, 2005.  (Id. ¶ 50)  This list shows that Babcock's civil service exam score was 87.5, while the SHTA Mid-Hudson promoted to Senior SHTA had a score of 95.  (Id.)

In sum, Defendants are entitled to summary judgment with respect to the "vacant bid positions" claim because Babcock has failed to establish a prima facie case of discrimination.

### D.  <u>Allegations Concerning the Registered Nurse Grant Program</u>

Babcock alleges that Defendants have discriminated against him based on his gender by failing to approve his applications for enrollment in Defendants' nursing grant program (the "RN Grant Program") on "several occasions," while on each occasion selecting female SHTAs for admission to the program.[9]  (Cmplt. ¶¶ 30–31)

Defendants argue that Babcock has not established a prima facie case of gender-based discrimination because he has not demonstrated "that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  <u>Holcomb</u>, 521 F.3d at 138.  In this regard, Defendants argue that Babcock has failed to show "that he was similarly situated to higher ranked candidates in all material respects," that he relies on a non-

---

[9]  The First Amended Complaint also alleges that Defendants refused to approve Babcock's application because of age discrimination, and notes that "the majority" of female SHTAs selected for the nursing program were "under the age of 40 years."  (Cmplt. ¶¶ 30-31)  As noted above (see n. 3 <u>supra</u>), Babcock has not addressed in his summary judgment opposition papers any age discrimination claim, and any such claim has therefore been abandoned.

probative hearsay statement by a non-decisionmaker, and that Babcock has failed to

"demonstrate any nexus between omissions or mistakes in the grant evaluation and Defendants'

alleged discriminatory intent."  (Defs. Reply Br. 3–7)  Defendants also note that Babcock was

accepted into the RN Grant Program on August 19, 2005, that he accepted placement in the RN

Grant Program, and enrolled in nursing school.  (Defs. Br. 12–13; Defs. R. 56.1 Stat. ¶¶ 52–53)

Even if Babcock has established a prima facie case of gender-based disparate treatment,

Defendants argue that they have set forth legitimate nondiscriminatory reasons for their actions,

which Babcock has not rebutted.

   Because Babcock has not established that he was similarly situated in all material

respects to the female candidates for the RN Grant Program who were admitted to the program

before him, he has not established a prima facie case of gender discrimination.  Moreover, even

if Babcock had established a prima facie case of gender discrimination, Defendants have

provided legitimate non-discriminatory reasons for their actions, and Babcock has not shown that

a reasonable factfinder could conclude that Defendants' determinations were the result of

gender-based discrimination.

   **1.**  **Undisputed Facts Regarding the Ranking and Selection of Mid-
     Hudson Candidates for the RN Grant Program**

   Defendant OMH's RN Grant Program provides funding to train select OMH staff

to become licensed Registered Nurses.  (Defs. R. 56.1 Stat. ¶ 51)  In early 2002, OMH surveyed

staff at its four upstate facilities, including Mid-Hudson, to ascertain who would be interested in

participating in the RN Grant Program.  (Id. ¶ 56)  In 2003, OMH surveyed those who had

expressed interest to determine if they remained interested.  (Id.)  Those candidates who had at

least a high school diploma or GED were interviewed by Darleen Walsh, the OMH employee

who administered the RN Grant Program.  (Id. ¶ 57; Pltf. R. 56.1 Stat. ¶ 9)  After interviewing

the candidates, Walsh ranked them in order of priority for placement in the RN Grant Program; she based her rankings solely on the cost and length of time for each candidate to complete the program.  (Pltf. R. 56.1 Stat. ¶ 9)  Among the ten Mid-Hudson candidates, Walsh ranked Babcock tenth because his training would cost the most, given that he had the most remaining credits necessary to complete training as a Registered Nurse.  (Id. ¶¶ 9-10; Defs. R. 56.1 Stat. ¶ 62)  From highest to lowest priority for placement, Walsh ranked the ten Mid-Hudson candidates in the following order:  (1) Pedro Santos; (2) Gloria Bullock; (3) Amelia MacDonald; (4) Gwendolyn Bailey; (5) Stacey Schoonmaker; (6) Richard McPhillips; (7) Karen McPherson; (8) Andrea Heinzel; (9) Kathleen Miller; and (10) Rick Babcock.  (Pltf. R. 56.1 Stat. ¶ 10)

Walsh then forwarded her rankings to Donna DeLusso, Mid-Hudson's Human Resources Director ("HR Director").  (Defs. R. 56.1 Stat. ¶¶ 11, 61)  DeLusso, Director of Nursing Elsbeth "Kitty" Mackay, and the former Acting Chief SHTA Joe Tirado (the "Mid-Hudson Committee") then discussed how to rank the ten candidates.  The Mid-Hudson Committee considered a number of factors, including a recommendation from each candidate's supervisor, the candidates' personal history and employment history at Mid-Hudson, their length of state service, and any criminal background that might bar licensure as a Registered Nurse. (See id. ¶¶ 18, 59, 63, 65; Pltf. R. 56.1 Stat. ¶ 11)  After discussing the candidates with Mackay and Tirado, DeLusso ranked the ten candidates on Mid-Hudson's behalf, and ranked Plaintiff tenth out of ten.  (Defs. R. 56.1 Stat. ¶¶ 66–69; Pltf. R. 56.1 Stat. ¶ 12)  From highest to lowest priority for placement, DeLusso's rankings were as follows:  (1) Karen McPherson; (2) Stacey Schoonmaker; (3) Gloria Bullock; (4) Andrea Heinzel; (5) Gwendolyn Bailey; (6) Kathleen Miller; (7) Amelia MacDonald; (8) Pedro Santos; (9) Richard McPhillips; and (10) Rick Babcock.  (Pltf. R. 56.1. Stat. ¶ 12)

DeLusso testified that she ranked Babcock tenth because his department head, Tirado, had rated him ninth out of the ten candidates; Director of Nursing Mackay stated that Babcock should not be admitted to the program;[10] Babcock's personnel folder contained a counseling memo;[11] and a printout of Babcock's computerized state employment record listed a suspension in his civil service history.  (Defs. R. 56.1 Stat. ¶ 69)  DeLusso ranked the other two male candidates, Pedro Santos and Richard McPhillips, eighth and ninth, respectively, because they, like Babcock, had counseling memos in their personnel files.  (Id. ¶ 73)

DeLusso entered her rankings next to Walsh's rankings and returned the candidate list to Walsh on February 12, 2004.  (Id. ¶ 75)  Once funds became available for disbursement, OMH determined that there were insufficient funds to accept all ten candidates at once and decided to accept candidates on a rolling basis as funding became available.  (Id. ¶¶ 76–77)  On May 7, 2004, OMH sent Babcock a letter stating that his name had been placed on a wait list for the RN Grant Program and that he would be contacted if a selected candidate was unable to participate or if more funds became available.  (Id. ¶ 78)  DeLusso's ranking order determined the sequence in which candidates received grants for the nursing program.[12]  (Id. ¶ 79)

---

[10]  Mackay believed that Babcock was not an appropriate candidate for the nursing program because he was often "defensive and confrontational" and "his demeanor and attitude were not conducive to good performance as a Nurse."  (Defs. R. 56.1 Stat. ¶¶ 71-72)

[11]  SHTAs receive counseling memos for committing certain infractions of Mid-Hudson policies and procedures.  (See Leonard Decl., Ex. N (DeLusso's Feb. 24, 2004 email to Committee) at D 4399 (listing reasons for issuance of counseling memos to Pedro Santos))

[12]  Plaintiff does not dispute that Defendant Holanchock had no knowledge of the ranking system used for selecting RN Grant Program recipients, that he never spoke to DeLusso about the ranking list or the candidates, and that he never spoke to Walsh about who should be selected to receive a grant.  (Defs. R. 56.1 Stat. ¶ 81)

Babcock was admitted into the RN Grant Program on August 19, 2005, accepted placement in the program, and enrolled in nursing school.  (Id. ¶¶ 52–53)

### 2. Whether the Circumstances Give Rise to an Inference of Gender-Based Discrimination

It is undisputed that the initial, cost-based ranking resulted in one male candidate (Pedro Santos) being ranked first, a second male candidate (Richard McPhillips) being ranked sixth, and the third male candidate (Plaintiff) being ranked tenth among the ten Mid-Hudson candidates for the RN Grant Program.  (Pltf. R. 56.1 Stat. ¶ 10)  It is also undisputed that the second subjective stage of ranking resulted in the seven female candidates being ranked first through seventh and the three male candidates being ranked eighth, ninth, and tenth.  (Id. ¶ 12)  The result of these rankings was that the seven female candidates became eligible for placement in the RN Grant Program before the three male candidates.  Accordingly, whereas Mid-Hudson's top three female candidates were admitted to the program in March 2004, Babcock was not admitted for another seventeen months.  (See Defs. R. 56.1 Stat. ¶¶ 52, 76–77)

Although Plaintiff's burden in establishing a prima facie case is "de minimis," Beyer 524 F.3d at 163, in "considering whether a plaintiff has raised an inference of discrimination by showing that [he] was subjected to disparate treatment, . . . the plaintiff must show [he] was 'similarly situated in all material respects'" to the individuals with whom [he] seeks to compare himself."  Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000) (quoting Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)).  "To be 'similarly situated' for Title VII purposes, a plaintiff must establish a 'reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases.'"  Weiss v. JPMorgan Chase & Co., No. 06 Civ. 4402 (DLC), 2008 WL 216619, at *14 (S.D.N.Y. Jan. 22, 2008) (quoting Graham, 230 F.3d at 40).

Here, Babcock has not shown that he was similarly situated in all material respects to the seven female candidates who DeLusso ranked ahead of him for the RN Grant Program.  Nor has Babcock countered Defendants' evidence that he materially differed from these female candidates because – among other reasons – his training would be more expensive, his (male) department head had rated him ninth out of the ten candidates, his personnel folder contained a recent counseling memo, and his civil service record indicated that he had been suspended in the past.  (See Defs. R. 56.1 Stat. ¶¶ 62, 69)  See Idrees v. City of New York, No. 04 Civ. 2197 (LAK)(GWG), 2009 WL 142107, at *10 (S.D.N.Y. Jan. 21, 2009) (concluding that Title VII/ADEA plaintiff failed to show "he was similarly situated in all material respects to the other individuals promoted" where he neither cited admissible evidence nor "rebutted the detailed evidence provided by the defendant of the elaborate, and numerically based, process that was undertaken to compare the various candidates and rate them").  Accordingly, Babcock has not established a prima facie case of gender-based discrimination based on Defendants' delay in admitting him to the RN Grant Program.

### 3.    Whether Defendants Have Articulated a Legitimate, Non-discriminatory Reason for Ranking the Three Male Candidates Lowest

Assuming arguendo that Babcock has established a prima face case of gender-based discrimination, Defendants have articulated legitimate, non-discriminatory reasons for ranking the three male candidates lowest among the ten applicants to the RN Grant Program.  With respect to DeLusso's decision to rank Babcock tenth among the candidates, there is no dispute that, at the time of ranking:  (1) Babcock's male department head Tirado had ranked him ninth out of ten candidates; (2) his personal history folder contained a counseling memo that had

been prepared within the previous three years;[13] and (3) his computerized state employment record listed a suspension in his civil service history.  (Defs. R. 56.1 Stat. ¶ 69; <u>see</u> Defs. Reply Br. 4, n.1; Silverman Decl., Ex. A (DeLusso Dep.) at 119:4-120:6))  There is no evidence that the female candidates ranked 1–7 were similarly situated to Babcock in any of these respects.  Nor is there any dispute that the other two male candidates, who were ranked 8–9, were the only other applicants whose personal history folders contained counseling memos that had been prepared within three years of DeLusso's ranking determination.  (<u>See</u> Defs. R. 56.1 Stat. ¶ 73; Defs. Reply Br. 4, n.1; Silverman Decl., Ex. A at 119:4-120:6)

Based on this undisputed evidence, Defendants have satisfied their burden of articulating legitimate non-discriminatory reasons for ranking the three male candidates eighth, ninth, and tenth, as well as for ranking Babcock last among the ten candidates.

### 4.       Whether Plaintiff Has Demonstrated That DeLusso's Ranking Determination was the Result of Gender-Based Discrimination

Babcock argues that the Defendants' proffered rationale for ranking the three male candidates lower than the seven female applicants is simply a pretext for a gender-based discrimination.  (Pltf. Br. 9–13)  In claiming that Defendants' proffered reasons are pretextual, Babcock argues that:  (1) his immediate supervisor's recommendation and performance evaluations were strong; (2) he and Pedro Santos had more state service than most of the female candidates; (3) Mid-Hudson's highest-ranked female candidate had a counseling memo in her personnel file; (4) DeLusso rejected OMH's request to admit Santos into the RN Grant Program in February 2004; (5) Walsh allegedly told Babcock that, "Nurses were mainly females and that's why we hired mostly females [for the nursing program];" (6) Mid-Hudson lost the

---

[13]   The union contract for SHTAs requires removal of counseling memos from personnel files after three years.  (Silverman Decl., Ex. A at 119:4-120:6; Leonard Decl., Ex. F (DeLusso Dep.) at 115:15-20)

February 2004 summary of Babcock's employee history file and had to re-create that summary

in June 2005; (7) DeLusso failed to verify the information in the computerized state record

concerning Babcock's prior civil service suspension; (8) in November 2004, Mid-Hudson

allegedly requested that Walsh bypass the remaining male three applicants to the nursing

program; and (9) in November 2005, Walsh sent the following note to someone concerning

Babcock's work and academic study plan:  "Don't hold your breath on this one – but the facility

insists."  (Id.)  Each of Babcock's arguments is addressed below.

> **a.**     <u>**Performance Evaluations and Supervisor Recommendation**</u>

Babcock argues that he had strong performance evaluations and a written

recommendation for the RN Grant Program from his immediate supervisor, Don Schoen.  (Pltf.

Br. 9; <u>See</u> Leonard Decl., Exs. H, K)  DeLusso and her Committee received a written

recommendation from each candidate's supervisor and reviewed each candidate's employment

history at Mid-Hudson (Defs. R. 56.1 Stat. ¶ 65), however, and there is no evidence that any of

the female candidates' performance evaluations or supervisor recommendations were inferior to

those of Babcock or the other male candidates.  Indeed, as described below in subsection (d),

there is evidence that the supervisor recommendations of Mid-Hudson's fourth and fifth-ranked

candidates – Andrea Heinzel and Gwendolyn Bailey – were stronger than the recommendation

for Pedro Santos, Mid-Hudson's eighth-ranked candidate.  (<u>See</u> Leonard Decl., Ex. N

(DeLusso's Feb. 24, 2004 email to Committee) at D4399)  Nor can Babcock's subjective

assessment of his relative performance create a genuine issue of material fact that would

preclude summary judgment.  <u>See</u> <u>Shabat v. Blue Cross Blue Shield of Rochester Area</u>, 925 F.

Supp. 977, 987–88 (W.D.N.Y. 1996) ("An employee's mere dissatisfaction with the pace of his

career progress, based on his subjective assessment of his own performance, is not enough to

make out a prima facie case under Title VII."), <u>aff'd</u> <u>sub</u> <u>nom.</u>,108 F.3d 1370 (table op.), 1997 WL 138836, at **1–2 (2d Cir. 1997).

### b.   Length of Service

Babcock argues that he and Pedro Santos had more state service than most of the female candidates, and that that "the majority of the female applicants had less than three years of state service at the time of the ranking." (Pltf. Br. 9)  A review of the seven female candidates' employee record cards, however, reveals that five of the women (and all of the top three female candidates) had nine or more years of service and that only two female candidates – Andrea Heinzel and Amelia MacDonald – had less than four years of service.[14]  (<u>See</u> Leonard Decl., Ex. T)  By comparison, Babcock had five years, and Santos had twenty years, of state service at the time of the ranking.  (Babcock Aff. ¶ 3; Leonard Decl., Ex. N at D4399)

Accordingly, while Babcock had far less service credit than most of the female candidates, Santos's service record was longer than any other candidate.  (<u>See</u> Leonard Decl. Ex. T)  Nonetheless, Babcock does not dispute that state service was only one of several factors that DeLusso and the Mid-Hudson Committee considered.  Moreover, as discussed in subsection (d), it is clear that DeLusso and the Committee considered the multiple counseling memos in Santos's personnel file in weighing his suitability for the nursing program.

### c.   McPherson's Prior Counseling Memo

Babcock argues that the counseling memos in his and the other male candidates' files do not differentiate the men from Mid-Hudson's most highly ranked female candidate,

---

[14]  Gwendolyn Bailey had less than three years of service at Mid-Hudson, but had received credit for ten years of service in the United States Army.  (<u>See</u> Leonard Decl., Ex. T)

Karen McPherson, because McPherson had received a counseling memo in April 1993.[15]  (Pltf. Br. 9–10)

There is no evidence that DeLusso and the other members of the Mid-Hudson Committee had access to an April 1993 counseling memo concerning McPherson.  As noted above, the union contract for SHTAs requires removal of counseling memos from personnel files after three years. Accordingly, pursuant to the union contract, the counseling memo McPherson received in April 1993 would not have been part of her personnel file in 2004, and there is no evidence that DeLusso or the other members of the Mid-Hudson Committee ever saw a counseling memo for McPherson.  (Silverman Decl., Ex. A at 119:4-120:6; Leonard Decl., Ex. F (DeLusso Dep.) at 115:15-24)

However, a handwritten summary prepared by DeLusso and her staff concerning McPherson did include the following reference:  "4/29/93 Counselling Memo."  (Leonard Decl., Ex. U)  Accordingly, it is a reasonable inference that DeLusso and the other members of the Mid-Hudson Committee were aware that McPherson had received a counseling memo in April 1993 when the candidates were ranked in February 2004.  Neither side has offered any evidence as to the nature of the counseling memo McPherson received in 1993, or the nature of the counseling memo Babcock received in 2002.  (Berridge Decl, Ex. H (DeLusso Dep.) at 109:5-9) It is Babcock's burden to show that he is similarly situated to McPherson, however, Mandell, 316 F.3d at 379, and no reasonable jury could conclude that Babcock and McPherson were similarly situated where she received a counseling memo in 1993 – and then maintained an unblemished record and received "excellent" performance reviews for the next eleven years

---

[15]  Babcock has not argued that any of the other female candidates had any counseling or disciplinary history, and the evidence indicates that they did not.  (Leonard Decl., Ex. F (DeLusso Dep.) at 121)

preceding the ranking (Leonard Decl., Ex. U), while Babcock – who began work at Mid-Hudson in 1999 – received a counseling memo in 2002, two years before the rankings, and had received performance ratings of "good."  (Leonard Decl., Ex. H).  Cf. Edwards v. Metro-North Commuter R.R. Co., 463 F. Supp. 2d 279, 283–84 (D. Conn. 2006) (terminated African-American lineman was not similarly situated to non-African-American linemen, where plaintiff had no personal knowledge of disciplinary violations or histories of alleged comparators, and defendants had offered testimony that no other lineman "had as serious a record as [plaintiff] of three major incidents of discipline within a three-year period") (citing Graham, 230 F.3d at 40).

### d.   Committee's February 26, 2004 Rejection of Santos

In February 2004, Walsh asked DeLusso whether Mid-Hudson would object to Santos being admitted to the Grant Program along with Mid-Hudson's three top-ranked candidates, all of whom were female.  Walsh explained that because Santos "was so close to getting his degree, there would be enough funds to allow his participation even though [Mid-Hudson] had ranked him as number 8."  (Leonard Decl., Ex. N (DeLusso's Feb. 24, 2004 email to Committee) at D4399)  DeLusso responded that Mid-Hudson did "NOT want Pedro Santos to get the grant but Gwen Bailey would be great."  (Id.)

Babcock fails to address, however, the reasons that DeLusso offered at the time as to why she preferred Gwendolyn Bailey and Andrea Heinzel over Santos.  DeLusso noted that Santos had received counseling memos on January 9, 2002 for time and attendance, on March 26, 2001 for "being in a non-prepared position," and on December 8, 2000 for "failure to make room checks or making room checks and not documenting [those checks]," and that the more

highly ranked Heinzel and Bailey had "nothing negative in their e files[16] and were rated higher by their supervisor."  (Leonard Decl. Ex. N at D4399)

Because Babcock has neither addressed the legitimate non-discriminatory explanations DeLusso provided at the time for favoring Bailey and Heinzel over Santos – nor shown that Santos and these female candidates were similarly situated in all material respects – Babcock's argument concerning Santos is not persuasive.

### e.   Walsh's Alleged Statement to Babcock

At his deposition, Babcock testified that after he was not selected for the first round of grantees, he asked Walsh why he wasn't chosen.  Walsh stated that "Nurses were mainly females and that's why we hired mostly females."  (Babcock Dep. 480:24-481:3)  As an initial matter, Walsh's statement is inadmissible hearsay that may not be considered for purposes of this motion.  LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005).  There is no evidence that Walsh – a Training Specialist at OMH (Defs. R. 56.1 Stat. ¶ 15) – has any personal knowledge of how DeLusso arrived at her ranking determinations.  It is undisputed that Walsh was not part of the Mid-Hudson Committee and did not play any role in the final ranking determination made by DeLusso.  Indeed, Walsh testified that she never had any discussions with DeLusso about how DeLusso arrived at her ranking order.  (Leonard Decl., Ex. E (Walsh Dep.) at 26:17-27:15)

Walsh's alleged statement is likewise not probative in that it does not shed light on any alleged discriminatory animus of DeLusso, the decision-maker.  Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 116 (2d Cir. 2007) ("The relevance of discrimination-related remarks . . . depend[s] . . . on their tendency to show that the decision-maker was

---

[16]  At Mid-Hudson, "e file" refers to an employee's personnel history file.  (Leonard Decl., Ex. F (DeLusso Dep.) at 123:7-13)

motivated by assumptions or attitudes relating to the protected class.")  Walsh was involved only in the initial, cost-based ranking, and Babcock concedes that her ranking list was "solely based" on cost.  (Pltf. R. 56.1 Stat. ¶ 9).  Accordingly, any discriminatory animus on Walsh's part did not affect her own initial ranking, much less DeLusso's decision.

### f.      Loss and Re-creation of Summary of Employee History File

As part of the February 2004 candidate ranking process, DeLusso and senior personnel administrator Pam Wontz reviewed each applicant's employee history file and created a one-page handwritten summary of that file.  (Leonard Decl., Ex. F (DeLusso Dep.) at 111-14) The purpose of the handwritten summaries was to assist in the ranking process.  (Id. at 167) Babcock complains that the Mid-Hudson Committee lost its summary of his file; that none of the other nine candidates' summaries was lost; that DeLusso and Wontz re-created this summary on June 30, 2005 after Babcock filed this lawsuit and an EEOC charge; that DeLusso's June 30, 2005 email to Wontz regarding the re-creation of the file referenced his May 11, 2005 "EEOC Complaint" in the subject heading; and that DeLusso instructed Wontz to write on the re-created summary that Babcock had a pending Notice of Discipline even though he had had no pending Notice of Discipline at the time of the 2004 ranking.  (Pltf. Br. 11–12)

Although there was a pending Notice of Discipline against Babcock as of June 30, 2005 when DeLusso and Wontz recreated the summary of Babcock's file (Leonard Decl., Ex. W (Apr. 15, 2005 Notice of Discipline); Ex. X (Apr. 26, 2006 Opinion and Award of Arbitrator), there had been no such pending notice against Babcock at the time of the February 2004 rankings.  (Leonard Decl., Ex. F (DeLusso Dep.) at 168:6-9)  Babcock argues that "[s]uch subversive actions cast doubt on the veracity of defendants' reasons for failing to rank plaintiff higher than any of the female applicants."  (Pltf. Br. 12)  The undisputed facts concerning this

incident, however, do not provide a basis for concluding that Defendants acted with

discriminatory animus.

DeLusso testified that she noticed that the summary of Babcock's personnel file

was missing from his RN grant folder "around June 30, 2005."  (Leonard Decl., Ex. F (DeLusso

Dep.) at 123:4-6)  While it is not clear from the record what motivated DeLusso to examine

Babcock's RN grant folder at that time, Babcock filed this lawsuit on March 22, 2004 and his

EEOC charge on May 11, 2005 and DeLusso became aware that the summary was missing after

Babcock filed these actions.  (DeLusso Dep. 136)  On June 30, 2005, DeLusso sent an email to

Wontz which reads as follows:

> Could you please go through Rick's e file so that we have the same
> summary for him as we had on the rest.  I went through one over
> head.  I didn't go through my overhead closet to my file cabinet.
> The actual one may be in there.
>
> thanks a lot [17] (Leonard Decl., Ex. P)

Wontz did not find the original summary (id.) but prepared a new one (Leonard

Decl., Ex. F (DeLusso Dep.) at 112-13) which reads as follows:

> Rick Babcock  SHTA  Perm Fulltime
> Perf evaluations all good
> 04 evals – suggested working on inter personal skills.
> No counseling memo in file.
>
> Wasn't he recently interrogated?  (Leonard Decl., Ex. Q)

DeLusso testified that the only differences between the lost summary and the new

summary were "No counseling memo in the file" and "Wasn't he recently interrogated?"  The

original summary made reference to a 2002 counseling memo because February 2004 – when the

---

[17]  When asked at her deposition why she asked Wontz to reconstruct the summary, DeLusso
testified:  "Because we had taken the personal history folder of each applicant and used that as
part of the ranking process, it was important that each employee's personal history file summary
be included."  (Leonard Decl., Ex. F (DeLusso Dep.) at 168:16-20)

original summary was prepared – was still within the three-year period for retention of

counseling memos, per the union contract.  (Leonard Decl., Ex. F (DeLusso Dep.) at 114:23-

115:24)

No reasonable jury could conclude, based on this evidence, that DeLusso ranked

Babcock last because of his gender.  At best, Babcock's evidence shows that Defendant Mid-

Hudson lost the February 2004 summary of Babcock's personnel file – but not the actual file on

which the summary was based (id. at 112:16-22); that DeLusso realized the summary was

missing after Babcock filed this lawsuit and/or EEOC charge; that she instructed Wontz to search

for the missing summary and recreate it if necessary; and that Wontz could not find the summary

and therefore recreated the document based on the information in Babcock's file.  It is

undisputed that the only substantive difference between the original document and the recreated

summary is the reference to a counseling memo:  the recreated summary indicated that the file

contained no counseling memo, while the original summary made reference to a 2002 counseling

memo because the 2002 memo was still within the three year period of retention at that time.

While Babcock complains that DeLusso instructed Wontz to mention a pending Notice of

Discipline – when such a notice was pending at the time of the recreation but had not been

pending at the time of the February 2004 rankings – the recreated summary makes no reference

to a Notice of Discipline.  (Leonard Decl., Ex. Q)  In sum, while Babcock characterizes these

actions as "subversive" (Pltf. Br. 12), he has not demonstrated that they constitute proof that

DeLusso and Mid-Hudson discriminated against him based on his gender.

### g.   Failure to Verify Computerized Record's Suspension Information

Babcock argues that DeLusso should have verified the suspension information in

the computer printout of his state employment record.  Babcock contends that verification would

have revealed that his prior suspension had been reversed pursuant to a Stipulation of Settlement entered as part of a court proceeding.  (Pltf. Br. 12–13; Babcock Aff. ¶ 18 n.1)  There is no evidence, however, that DeLusso played any part in creating or maintaining this record, or that she acted in bad faith in relying on it.  The fact that she may have relied on incorrect information is immaterial to Babcock's gender-based discrimination claim.  See Agugliaro v. Brooks Bros., Inc., 927 F. Supp. 741, 747 (S.D.N.Y. 1996) ("Even assuming defendants were wrong in their belief that plaintiff had engaged in sexual misconduct, what is significant is that they based their decision to dismiss plaintiff on that belief, and not on his age, gender, or pension status."); Balos v. Norden Sys., Inc., No. 88 Civ. 8337 (RWS), 1989 WL 126097, at *4 (S.D.N.Y. Oct. 13, 1989) ("'In satisfying [plaintiff's] burden of proving intentional discrimination, plaintiff cannot rely merely on the fact that an employer based its decision on incorrect or mistaken information or that it was an unfair decision.'") (citation omitted) (alteration in original).  See also Graham, 230 F.3d at 44 (concluding that claim that employer's "test result was a pretext for a discriminatory discharge [did] not raise a triable issue of fact" because "[r]easonable reliance by an employer on a laboratory test, even where misplaced, does not provide any basis for a jury to find pretext").  In short, DeLusso's failure to verify the suspension information in the computer printout of Babcock's employment record does not constitute evidence of gender discrimination.

> **h.**     **Alleged November 2004 Request to Bypass Male Candidates**

Babcock alleges that in November 2004, after all of the higher-ranked female candidates had been accepted into the RN Grant Program, Mid-Hudson asked Walsh to bypass the remaining three male applicants – Santos, McPhillips, and Babcock – in favor of other candidates.  (Pltf. Br. 13; Leonard Decl., Ex. E (Walsh Dep.) at 49–50)  There is no such evidence.  In making this argument, Babcock mischaracterizes Walsh's testimony on this issue.  First, the request came not from a member of the Mid-Hudson Committee but rather from Bob

Glover, the male director of training at Mid-Hudson, and someone who had no knowledge of the ranking of Santos, McPhillips, and Babcock.  (Leonard Decl., Ex. E (Walsh Dep.) at 50:13-23, 52:10-20)  Second, Walsh testified that Glover had simply asked her to consider additional candidates for the program, not to bypass McPhillips, Babcock, or Santos.  (Id. at 52:10-24)  Moreover, when DeLusso learned of Glover's suggestion, she stated, "I don't believe we should go there" and that employees should continue to be admitted to the RN grant program from the waiting list.  (Id. at 53:16-22)

### i.     Walsh's November 4, 2005 Note Regarding Babcock

Finally, Babcock points to a November 4, 2005 fax cover sheet that Walsh allegedly sent to someone named Penny Wilsa regarding a Plan for Work and Academic Study for Babcock.  (Pltf. Br. 13)  There is no evidence in the record as to where Wilsa works or what her duties are, and neither side has provided the plan referred to in the cover sheet.  The cover sheet contains the following cryptic handwritten note:

> Hi Penny,  Here is Mr. Babcock's Plan for Work & Academic
> Study.  He is now considering/talking to OCCC not Empire.  Don't
> hold your breath on this one – but the facility insists.  Darleen
> (Leonard Decl., Ex. S)

Whatever this note refers to, Babcock has not explained how it constitutes evidence of discriminatory intent.

### 5.     Conclusion

For the reasons set forth above, this Court concludes that, "without the aid of the presumption" of discrimination raised by the prima facie case, Babcock has not "raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the [delay in admitting Babcock to the RN Grant Program] was based, at least in part on the fact [that he was male]."  Holcomb, 521 F.3d at 141.  Accordingly, Defendants are entitled to

summary judgment with respect to Babcock's disparate treatment claim arising from Defendants' administration of the RN Grant Program.

## IV.   **BABCOCK'S HOSTILE WORK ENVIRONMENT CLAIM**

Babcock's hostile work environment and retaliation claims incorporate his disparate treatment allegations by reference.  In addition, Babcock alleges that he was "forced to endure continued and repeated abuse and hostility based upon his gender in retaliation of [sic] engaging in protected activity."  (Cmplt. ¶ 55)  Babcock further asserts that Defendants "intentionally and willfully harassed [him] and permitted [him] to be harassed in employment on account of gender and in retaliation for opposition to discrimination . . . ."  (Id. ¶ 56)  Babcock claims that neither Defendant OMH nor its agents took "significant action . . . to stop the harassment of [P]laintiff thereby contributing to a hostile work environment."  (Id. ¶ 57)  After he complained of discrimination, Babcock claims that Chief SHTA James P. Neale "continuously assigned" Babcock to overtime assignments on the same ward as John Bennett, despite Neale's awareness of a staff separation directive designed to prevent Bennett "from coming in contact with Babcock while working."[18]  (Pltf. Br. 16)  According to Babcock, this "directive was issued as a result of a workplace violence incident wherein Mr. Bennett threatened to harm Mr. Babcock."  (Id.)

In moving for summary judgment, Defendants argue that Babcock has "identified only one date that he actually worked with Mr. Bennett," that Babcock "does not allege that any incident occurred between them," and that this event is too "episodic" to create a hostile work environment.  (Defs. Reply Br. 7–9)

---

[18]  As Mid-Hudson's Chief SHTA during the relevant time period, Neale was responsible for overseeing the entire SHTA department.  (Defs. R. 56.1 Stat. ¶¶ 13–14)

A.   **Applicable Law**

To prevail on a hostile work environment claim under Title VII, a plaintiff must show (1) "that the harassment was 'sufficiently severe or pervasive to alter the conditions of . . . [his] employment and create an abusive working environment,'" (2) "that the conduct occurred because of [the plaintiff's] sex," and (3) "that a specific basis exists for imputing the objectionable conduct to the employer." Alfano v. Costello, 294 F.3d 365, 373–74 (2d Cir. 2002) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)).[19]  Satisfying this standard entails "showing both 'objective and subjective elements:  the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment,' and the [plaintiff] must also subjectively perceive that environment to be abusive." Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004) (quoting Alfano, 294 F.3d at 374) (internal quotation omitted).  "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Alfano, 294 F.3d at 374 (quoting Perry, 115 F.3d at 149).  "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." Alfano, 294 F.3d at 374.  See Petrosino v. Bell Atlantic, 385 F.2d 210, 224 (2d Cir. 2004) ("Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment.").  "But it is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." Alfano, 294 F.3d at 374.

---

[19]  The same standards apply to Babcock's claims under Title VII and the NYSHRL, including with respect to imputing liability to Defendant Mid-Hudson. See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d Cir. 1998) ("[B]ecause New York courts require the same standard of proof for claims brought under section 296 of the Human Rights Law as for those brought under Title VII, we can analyze these claims in tandem," including with respect to an employer's liability for alleged co-worker harassment) (citation omitted). See also Schiano, 445 F.3d at 609 (hostile work environment claims are generally subject to same standards under federal and New York state law).

"To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." Id.  See Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993) (relevant circumstances include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance").

### B.   The "John Bennett" Overtime Assignment Claim

Babcock has not shown that the alleged harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. While Babcock claims that Chief SHTA Neale "continuously assigned" him to overtime assignments on the same ward as Bennett (Pltf. Br. 16), he has specified only two instances six months apart – August 10, 2004 and February 13, 2005 (Babcock Aff. ¶¶ 14, 16; Leonard Decl., Ex. Z (Feb. 14. 2005 Grievance)) – in which he and Bennett may have been assigned to overtime shifts on the same ward.

In light of the episodic nature of these assignments, the absence of any evidence that they unreasonably interfered with Plaintiff's work performance, and a similar lack of evidence that Babcock's gender influenced Chief SHTA Neale, another male, to assign him to work overtime shifts on Bennett's ward, Babcock has not shown either that Neale's alleged actions were "'severe or pervasive enough to create an objectively hostile or abusive work environment'" or that Neale's assignments "occurred because of [Babcock's] sex." Feingold, 366 F.3d at 150 (quoting Alfano, 294 F.3d at 374) (internal quotation omitted).[20]  Accordingly,

---

[20]  Babcock has likewise not demonstrated "that a specific basis exists for imputing [Neale's allegedly] objectionable conduct to the employer." Alfano, 294 F.3d at 373 (citing Perry, 115 F.3d at 149).

Defendants are entitled to summary judgment concerning Babcock's hostile work environment claim.

## V.     BABCOCK'S RETALIATION CLAIMS

In connection with his retaliation claims, Babcock repeats his generalized allegations of abuse, hostility and harassment.  (Cmplt. ¶¶ 61-63)  In addition, Babcock asserts the following specific acts of retaliation:

> (1) Chief SHTA James Neale, "repeatedly changed" Babcock's "work assignment from his regular bid job on Ward 31/32 . . . on overtime shifts" (Pltf. Br. 16);
>
> (2) Neale continuously assigned Babcock to overtime shifts on the same ward as his co-worker John Bennett, "despite a staff separation directive issued by the facility preventing Mr. Bennett from coming in contact with plaintiff while working" (id.);
>
> (3) Defendants "intentionally interfered with [P]laintiff's ability to represent union members in his capacity as a Sector Steward" (id. at 17); and
>
> (4) Neale falsely charged that Babcock had "verbally threatened" him during a telephone conversation.  (Id.).

In moving for summary judgment, Defendants argue that Babcock has failed to demonstrate that any of these "alleged retaliatory actions were in response to Plaintiff's protected activities" and therefore that there is no "causal connection" between Plaintiff's protected activities and any adverse employment action.  (Defs. Reply Br. 7–8)  Defendants further contend that the alleged retaliatory acts "do not constitute materially adverse changes in the terms and conditions of [Babcock's] employment."  (Id. at 8)

### A.     Applicable Law

Courts evaluate Title VII retaliation claims using a three-step burden-shifting analysis:

First, the plaintiff must establish a prima facie case. That is, an employee must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." McMenemy v. City of Rochester, 241 F.3d 279, 282–83 (2d Cir. 2001). The burden of proof that must be met to permit a Title VII plaintiff to survive a summary judgment motion at the prima facie stage has been characterized as "'minimal' and 'de minimis.'" Woodman v. WWOR-TV, 411 F.3d 69, 76 (2d Cir. 2005) (quoting Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001)). In determining whether this initial burden is satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive. See Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987).

If a plaintiff sustains the initial burden, a presumption of retaliation arises. In turn, under the second step of the burden-shifting analysis, the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. See Quinn, 159 F.3d at 768. Finally, as for the third step, once an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action.

Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).[21]

A plaintiff may show retaliatory intent with direct evidence "of retaliatory animus directed against the plaintiff" or with circumstantial evidence, including evidence that "the protected activity was followed closely by discriminatory treatment" or evidence of "disparate treatment of fellow employees who engaged in similar conduct." Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001) (internal quotation omitted) (describing how a plaintiff may meet his or her burden at the third stage); see also McNair v. New York City Health & Hosp. Co., 160 F. Supp. 2d 601, 604 (S.D.N.Y. 2001) (listing same types of evidence as sufficient to establish

---

[21]  The same standards apply to Babcock's retaliation claims under federal and state law. Schiano, 445 F.3d at 609 ("[R]etaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII.").

fourth element of prima facie case).  Further, at the third stage, "[u]nder some circumstances, retaliatory intent may also be shown, in conjunction with the plaintiff's prima facie case, by sufficient proof to rebut the employer's proffered reason for the [adverse employment action]." Raniola, 243 F.3d at 625.

   **B.    Babcock Has Established the First Two Elements of a
            Prima Facie Retaliation Case**

           Defendants do not dispute that Babcock has established the first two elements of a prima facie case of retaliation.  Babcock has established that he engaged in protected activity by: filing this lawsuit on March 22, 2004; filing a grievance with his employer on January 18, 2005, in which he alleged gender discrimination based on Defendants' ranking of applicants for the RN Grant Program and acceptance of female applicants into the program; and filing an EEOC charge of gender-based discrimination and retaliation on May 11, 2005. [22]  (Pltf. Aff. ¶¶ 9–11)

           It is also clear that Defendants knew of Babcock's protected activity.[23]

Defendants learned of the commencement of this action no later than Babcock's service of the

---

[22]  Babcock clearly engaged in protected activity when he filed his EEOC charge, as Defendants implicitly acknowledge.  See Linder v. Int'l Bus. Mach. Corp., No. 06 Civ. 4751 (RJS), 2008 WL 2461934, at *7 n.9 (stating that plaintiff engaged in protected activity both when she filed an internal complaint and attempted to file an EEOC charge several months later); Charles v. City of New York, No. 99 Civ. 3786 (RWS), 2007 WL 2728407, at *11 (S.D.N.Y. Sept. 17, 2007) (plaintiff "engaged in protected activity by complaining of discrimination internally" and by filing three EEOC charges during the same time period).

Babcock also argues that he engaged in protected activity when he complained to Darleen Walsh, an OMH Training Specialist, "shortly after the selection of the top four ranked female applicants for the Nursing Grant Program. . . ."  (Pltf. Br. 14)  However, Babcock has offered no evidence for this argument and makes no reference to it in his Rule 56.1 Statement, his affidavit, or his attorney's declaration opposing summary judgment.  Accordingly, this Court will not consider this argument.

[23]  To find that a plaintiff engaged in protected activity and that the employer knew about that activity, a court must find that "the employer . . . understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." Galdieri-Ambrosini v. National Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998).  A reasonable jury could find in Plaintiff's favor on this issue.

Complaint on March 23, 2004.  (See Docket No. 3 (documenting that Summons and Complaint were served on all Defendants on March 23, 2004))  Defendants knew immediately – or soon thereafter – of Babcock's January 18, 2005 grievance.  And while the parties have not offered direct evidence showing when Defendants learned that Plaintiff had filed an EEOC charge, a jury could reasonably infer that it was sometime between May 11, 2005, when he filed the charge, and June 30, 2005, when Mid-Hudson's HR Director (DeLusso) emailed a senior personnel administrator (Wontz) regarding Babcock's EEOC charge.  (See Leonard Decl., Ex. P at D4013)

Thus, Babcock has established the first two elements of a prima facie retaliation case in that, with Defendants' knowledge, he engaged in protected activity on March 23, 2004, January 18, 2005, and May 11, 2005.

## C.   Whether the Alleged Retaliatory Acts Could Constitute Adverse Employment Actions

In the context of a retaliation claim, an adverse employment action is one that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Burlington N. & Santa Fe R.R. Co. v. White, 548 U.S. 53, 68 (2006) (citation omitted).  "[P]etty slights, minor annoyances, and simple lack of good manners" will not normally constitute adverse employment actions for purposes of a retaliation claim.  Id.  A plaintiff must show "material adversity," because "it is important to separate significant from trivial harms."  Id. (emphasis in original).

### 1.   Alleged Retaliatory Changes in Overtime Assignments

Babcock asserts that – following the filing of this lawsuit – his overtime supervisor James Neale "repeatedly changed" his ward assignment on overtime shifts from his "regular bid job on Ward 31/32. . . ."  (Pltf. Br. 16)  Babcock contends that these repeated changes constitute an adverse employment action because "SHTA bid positions are granted on

37

the basis of seniority," and "ward assignment to an SHTA's regular bid job allows for continuity

of patient care and is a privilege normally given to SHTAs with seniority, like [P]laintiff."  (Id.)

Furthermore, Babcock asserts that Neale permitted junior SHTAs to remain on their regular bid

wards for overtime shifts during this period.  (Id., see Babcock Aff. ¶ 15)  Babcock also repeats

his hostile work environment argument that Neale "continuously assigned" him to work overtime

shifts on the same ward as John Bennett in retaliation for engaging in protected activity.  (Pltf.

Br. 16)  Babcock avers that grievances he filed on August 27, 2004 and February 14, 2005 were

in response to these allegedly retaliatory assignments.  (Babcock Aff. ¶¶ 14, 16)

       Babcock has not offered sufficient evidence, however, to establish that Neale's

staffing determinations constitute an adverse employment action.  Babcock's alleged loss of the

"privilege" of remaining on his bid ward for overtime shifts amounts to nothing more than the

sort of "[p]etty slight[]" or "minor annoyance[]" that is generally non-actionable in the retaliation

context.  White, 548 U.S. at 68.  And as discussed above with respect to the hostile work

environment claim, Babcock has only identified two instances in which he came into contact

with Bennett as a result of Neale's staffing determinations.  Moreover, the fact that Babcock

responded by filing grievances suggests that Neale's staffing decisions did not "dissuade

[Plaintiff] from making or supporting a charge of discrimination."  Id.  Nor has Babcock shown

that Neale's actions "well might have 'dissuaded [another] reasonable worker from making or

supporting a charge of discrimination.'"  Id.

       Accordingly, Babcock has not shown that he suffered "material adversity" as a

result of the allegedly retaliatory staffing decisions of Chief SHTA Neale (id.) (emphasis in

original) and Defendants are entitled to summary judgment on this claim.

### 2.    Alleged Retaliatory Interference in Union Activities

Babcock contends that, in retaliation for his protected activities, Defendants "intentionally interfered with [his] ability to represent union members in his capacity as a Sector Steward . . . for NYSCOBA [sic],[24] the collective bargaining unit for SHTAs."  (Pltf. Br. 17) Babcock asserts that on January 20, 2005, Neale denied him permission to attend a labor/management meeting at Mid-Hudson that only one other Mid-Hudson union representative was attending.  Babcock filed a grievance on January 31, 2005 concerning this denial.[25] (Babcock Aff. ¶¶ 20-21)

Babcock's evidence on this issue is not sufficient to show that Neale's refusal was anything other than a legitimate work-related determination.  First, as Babcock concedes, another union representative was already attending the January 20, 2005 labor/management meeting. (Babcock Aff. ¶ 20)  Second, Babcock has not addressed Neale's testimony that on the one occasion that he denied Babcock leave to attend a labor/management meeting, he did so because of the need to maintain Mid-Hudson's "minimum staffing ratio" to ensure "the safety and security of both the patients and staff members."  (Leonard Decl., Ex. BB (Neale Dep.) at 26:6-15)  Third, it is not even clear from the record that Babcock was not permitted to attend the January 20 meeting.  While that is his claim here, the grievance Babcock filed on January 31, 2005 complains not that he wasn't allowed to attend the meeting, but rather that he "was denied

---

[24]  The New York State Correctional Officers & Police Benevolent Association, Inc. ("NYSCOPBA") is the collective bargaining unit for SHTAs.  (See Leonard Decl., Ex. AA (Babcock Jan. 31, 2005 grievance); Leonard Decl., Ex. F (Delusso Dep.) at 115:16-17 (spelling out acronym as "N-Y-S-C-O-P-B-A")))

[25]  Babcock also asserts that Neale retaliated against him by denying him "overtime assignments because [he] was attending a labor/management meeting at Mid-Hudson in his capacity as a Sector Steward."  (Id. ¶ 20)  Babcock has offered no evidence of this assertion.

overtime pay while he participated in a Labor/Management meeting from 10:00 a.m. to 12:00 noon."  (Leonard Decl., Ex. AA (Babcock Jan. 31, 2005 grievance))

Babcock has also not shown that he suffered a "material adversity" as a result of Neale's alleged retaliatory interference with Babcock's union representative activities.  Babcock has not disputed Neale's testimony that Neale denied Plaintiff leave to attend a labor/management meeting only "one time."  (Id., Ex. BB (Neale Dep.) at 25:25–26:2)

Finally, as with Babcock's allegations concerning retaliatory staffing assignments, Neale's alleged interference with Babcock's union activities did not "dissuade" Babcock from filing (1) his January 31, 2005 grievance, or (2) his May 11, 2005 EEOC charge and thereby "'making or supporting a charge of discrimination.'"  White, 548 U.S. at 68 (citation omitted).

For all of these reasons, Defendants are entitled to summary judgment on this claim.

### 3.       **Alleged Retaliatory Discipline**

Babcock asserts that on April 13, 2005, Neale filed "false charges" against him alleging that Babcock "had verbally threatened him during [a] telephone conversation" in which Babcock was complaining to Neale about an assignment to an overtime shift on Ward 35/36, where John Bennett worked.  (Pltf. Br. 17-18; see Leonard Decl., Ex. W (Apr. 13, 2005 Notice of Discipline))  Neale alleged that after he invited Babcock to file a grievance concerning his overtime assignments, Babcock stated that he would not grieve the issue "but would 'deal with [Neale in] another way' or words to that effect."  (Leonard Decl., Ex. W at D4548).

The April 13, 2005 Notice of Discipline reads as follows:

Charge #1:  On March 16, 2005 between 7:00 am and 8:00 am, you acted in an inappropriate manner when you stated in a telephone conversation to Security Hospital Supervising Treatment Assistant, James Neale, that you would not grieve an issue "but would deal with you another way" or words to that effect.  (Leonard Decl., Ex. W at D4548)

40

Babcock's account of this conversation – as presented at his deposition – is not materially different.[26]  Babcock testified that after he complained to Neale about his overtime assignment, Neale commented that "it was another grievance for me to file."  Babcock testified that he then responded, "A grievance or something else?"  (Id., Ex. D (Babcock Dep.) at 82:13-14, 83:9-11, 85:3-25)

Neale interpreted Babcock's response as a threat.  (Id., Ex. X (Apr. 26, 2006 Opinion and Award of Arbitrator) at D4557)  At the arbitration, Babcock did not deny that he intended to threaten Neale, but insisted that the threat he would have expounded on – if Neale had not hung up – was that Babcock would "pursue the matter with a higher authority in management," not that he would commit an act of violence against Neale.  (Id., Ex. D (Babcock Dep.) at 85:3-25; Ex. X (Apr. 26, 2006 Opinion and Award of Arbitrator) at D4554-55)  On April 26, 2006, an arbitrator dismissed the disciplinary charge against Babcock, finding that OMH and Mid-Hudson had not met their burden of proof because the language Neale complained about was

> reasonably open to more than one interpretation.  It may have been
> meant to convey a threat of violence, but it also may have been
> meant to convey a threat, as Grievant and the Union claim, to go
> over Neale's head, outside of the routine grievance process. . . .
> (Id. at D4557) (emphasis in original).

Defendants do not address whether Neale's charge that Babcock "verbally threatened him" and the ensuing Notice of Discipline could constitute an adverse employment action.  Although this incident did not dissuade Babcock from filing his EEOC claim on May 11, 2005 – just four weeks after the Notice of Discipline was issued – this Court cannot rule as a

---

[26]  Babcock does not address the content of his conversation with Neale either in his Rule 56.1 Statement or in his affidavit.

matter of law that Babcock did not experience an adverse employment action when Neale

charged that Plaintiff had verbally threatened him.

**D.      Whether Babcock Can Show a Causal Connection between the Remaining
          Alleged Adverse Employment Action and His Protected Activity**

          To establish a prima facie case of retaliation with respect to the remaining alleged

adverse employment action – the April 13, 2005 Notice of Discipline – Babcock must offer some

evidence from which a jury could infer a causal connection between the Notice of Discipline and

his protected activity.  Babcock has identified two instances prior to April 13, 2005 in which he

engaged in relevant protected activity:  (1) his March 22, 2004 filing of this lawsuit; and (2) his

January 18, 2005 grievance alleging gender discrimination.

          Where, as here, there is no direct evidence that the alleged adverse action was

retaliation for engaging in protected activity, "[t]he causal connection needed for proof of a

retaliation claim can be established indirectly by showing that the protected activity was closely

followed in time by the adverse action."  Feingold, 366 F.3d at 157 (citation and internal

quotation marks omitted).  As a matter of law, the thirteen-month gap between the

commencement of this lawsuit and the filing of the Notice of Discipline is too long to permit this

Court to find a causal connection.  See, e.g., Nicastro v. Runyon, 60 F. Supp. 2d 181, 185

(S.D.N.Y. 1999) ("Claims of retaliation are routinely dismissed when as few as three months

elapse between the protected EEO activity and the alleged act of retaliation."); Ponticelli v.

Zurich Am. Ins. Group, 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (two-and-a-half month gap too

long to give rise to inference of causal connection).

          However, the three-month gap between the filings of the January 18 grievance

and the April 13 Notice of Discipline is on the borderline of what courts in this Circuit have

typically found sufficient to establish a plaintiff's prima facie case.  Compare Burkybile v. Board

42

of Educ. of the Hastings-on-Hudson Union Free Sch. Dist., 411 F.3d 306, 314 (2d Cir. 2005)

(stating that this Circuit "has not established a specific delay between protected activity and

adverse employment action that defeats an inference of causation" and noting that an inference

of retaliatory intent has been found in cases involving a gap of as long as eight months), with

Harrison v. North Shore Univ. Hosp., No. 04 Civ. 2033 (WDW), 2008 WL 656674, at *12

(E.D.N.Y. Mar. 6, 2008) ("[C]ase law indicates that a gap of up to one to two months between

the protected activity and the adverse action may establish the requisite causal connection,"

while "[l]onger gaps . . . have been found to be too attenuated to establish a causal connection.");

Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("Three months is

on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an

inference of causation."); Nicastro, 60 F. Supp. 2d at 185 (routine dismissals for gaps over three

months); Ponticelli, 16 F. Supp. 2d at 436 (two-and-a-half month gap too long).

       This Court declines to rule as a matter of law that the three-month gap between

the January 18 grievance and the April 13 Notice of Discipline is insufficient to establish "that

the protected activity was closely followed in time by the adverse action." Feingold, 366 F.3d at

157.  Accordingly, Babcock has established a prima facie case of retaliation with respect to the

Notice of Discipline's charge that Babcock verbally threatened Neale.

    **E.**    **Defendants' Proffered Reasons for Neale's Filing of the Notice of Discipline**

       Because Plaintiff has established a prima facie case, the burden shifts to

Defendants to "demonstrate that a legitimate, nondiscriminatory reason existed for [their]

action." Raniola, 243 F.3d at 625.  With respect to the alleged retaliatory action, the Notice of

Discipline itself offers a legitimate, non-discriminatory reason for its filing.  As noted earlier, the

Notice of Discipline charges that Babcock had "acted in an inappropriate manner when [he]

stated in a telephone conversation to [Neale that he] would not grieve an issue 'but would deal

with [Neale in] another way' or words to that effect.  (Leonard Decl., Ex. W at D4548)

As is also discussed above, Babcock's account of his conversation with Neale does not differ

materially from Neale's account.  Indeed, Babcock does not deny that he intended to threaten

Neale.  The arbitrator noted that it is also "relatively undisputed" that after this conversation,

Neale called back Babcock to advise that:  (1) he took Babcock's statement "about an alternative

course to filing a grievance[] as a threat, and that [(]2) in consequence of that, he intended to

report the incident to management."  (Leonard Decl., Ex. X at D4553)

   In sum, Defendants have articulated a legitimate, non-discriminatory reason for

the filing of the Notice of Discipline – namely, that Babcock made a verbal threat to Neale in

their March 16, 2005 telephone conversation.

> **F.**  **Babcock's Showing of Retaliatory Intent**

   Because Defendants have provided a legitimate, non-retaliatory reason for the

Notice of Discipline, "the presumption of retaliation dissipates," and Babcock must offer

evidence from which a jury could find "that retaliation was a substantial reason for the adverse

employment action."  Jute, 420 F.3d at 173.  To meet his burden, Plaintiff relies solely on the

timing of the adverse action.  (Pltf. Br. 17–18)  Indeed, nothing in Plaintiff's brief, affidavit, Rule

56.1 Statement or proffered deposition excerpts puts into dispute Neale's claim that Babcock

threatened him during their March 16, 2005 call.

   The Second Circuit has recognized that "under some circumstances, retaliatory

intent may . . . be shown, in conjunction with the plaintiff's prima facie case, by sufficient proof

to rebut the employer's proffered reason for the [adverse employment action]."  Raniola, 243

F.3d at 625.  Moreover, summary judgment may be improper where there is evidence that the

defendant's proffered reasons are partially pretextual.  See, e.g., Ebanks v. The Neiman Marcus

Group, Inc., 414 F. Supp. 2d 320, 331 (S.D.N.Y. 2006) (summary judgment inappropriate because there were genuine factual disputes as to whether employer's reasons for the adverse employment actions "were in part pretextual"); Rooney v. Capital Dist. Transp. Auth., 109 F. Supp. 2d 86, 98-99 (N.D.N.Y. 2000) (summary judgment inappropriate because there was "a sufficient basis for a trier of fact to conclude . . . that the reasons defendant offered for plaintiff's dismissal were at least partially pretextual").  In this case, however, Babcock has not offered any evidence that Defendants' proffered reason for filing the Notice of Discipline is pretextual.

Courts have held that where, as here, the only evidence of retaliatory intent is temporal proximity between the protected activity and the alleged adverse action, and the defendant has offered a legitimate, non-retaliatory reason for the action, the defendant is entitled to summary judgment.  See Bain v. Wal-Mart Stores, Inc., 585 F. Supp. 2d 449, 454 (W.D.N.Y. 2008) (finding it "well-settled that temporal proximity alone is insufficient to overcome an employer's legitimate, nondiscriminatory reason for terminating a plaintiff's employment" and thus four-day gap between protected activity and termination could not, standing alone, overcome employer's legitimate, nondiscriminatory reason); Murray v. Visiting Nurse Serv. of New York, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (at third stage, "district courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action [without more] does not allow for an inference of causation").

Because Babcock has not provided evidence that overcomes Defendants' articulated legitimate, non-discriminatory reason for issuing the April 13 Notice of Discipline, Defendants are entitled to summary judgment on this aspect of Babcock's retaliation claim.

**VI.    THE ELEVENTH AMENDMENT BARS BABCOCK'S**
**NYSHRL CLAIMS AGAINST OMH AND MID-HUDSON**

OMH and Mid-Hudson contend that the Eleventh Amendment entitles them to

immunity with respect to Babcock's NYSHRL claims.  (Defs. Br. 3–5)  Babcock's brief does not

address this issue.

**A.    Applicable Law**

The Eleventh Amendment provides:  "The Judicial power of the United States

shall not be construed to extend to any suit in law or equity, commenced or prosecuted against

one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign

State."  U.S. Const. amend. XI.  "Although the Eleventh Amendment does not apply to suits

against counties, municipal corporations, and other political subdivisions, [a governmental

entity] is entitled to immunity if it can demonstrate that it is more like 'an arm of the State,' such

as a state agency, than like 'a municipal corporation or other political subdivision.'"  Mancuso v.

New York State Thruway Authority, 86 F.3d 289, 292 (2d Cir. 1996) (quoting Mt. Healthy City

Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977)).  See Avni v. Pilgrim Psychiatric

Ctr., No. 05 Civ. 5346, 2006 WL 2505241, at *4 (E.D.N.Y. Aug. 28, 2006) ("Eleventh

Amendment immunity also shields arms of the state, like a state agency.") (citing Mancuso, 86

F.3d at 292).

"Despite this general bar to suits against states created by the Eleventh

Amendment, there are two well-established ways to provide judicial power over such cases:

abrogation of immunity by Congress and waiver of immunity by a state."  In re 995 Fifth Ave.

Assocs., L.P., 963 F.2d 503, 507 (2d Cir. 1992).  See Kostok v. Thomas, 105 F.3d 65, 68 (2d Cir.

1997) ("As a general matter, the Eleventh Amendment bars suits of any sort against a state in

federal court unless the state has consented to be sued or Congress has expressly abrogated the

state's immunity.").  With respect to the second exception, courts will only find that a state has

waived its immunity where the waiver is unambiguous:

> Waiver will only be found, however, "where stated 'by the most
> express language or by such overwhelming implications from the
> text as [will] leave no room for any other reasonable
> construction.'"  Edelman [v. Jordan], 415 U.S. [651,] 673, 94 S.
> Ct. [1347,] 1361 [(1974)], (quoting Murray v. Wilson Distilling
> Co., 213 U.S. 151, 171, 29 S. Ct. 458, 464, 53 L.Ed. 742 (1909)).
> States cannot "constructively consen[t]" to waiver of their
> Eleventh Amendment protection from suit.  Edelman, 415 U.S. at
> 673, 94 S. Ct. at 1360.

Santiago v. New York State Dep't of Corr. Servs., 945 F.2d 25, 30 (2d Cir. 1991).

   **B.    Defendants OMH and Mid-Hudson are Entitled to Eleventh Amendment
          Immunity with Respect to Babcock's NYSHRL Claims**

"Defendant OMH is an agency of the state, created by statute, through which state

policies are implemented," and  "Mid-Hudson . . . is a 'hospital' within the 'office' of the

Commissioner of OMH," "is a state facility and [is] entitled to the state's immunity."  Vallen v.

Mid-Hudson Forensic Office of Mental Health, No. 02 Civ. 5666 (PKC), 2004 U.S. Dist. LEXIS

17573, at *8 (S.D.N.Y. Sept. 1, 2004) (citing N.Y. Mental Hyg. Law §§ 7.01, 7.07, 7.17).

Moreover, "'[n]othing in [New York's Human Rights Law] provides any basis for finding that

New York State has waived its Eleventh Amendment immunity.'"  Lee v. New York State Dep't

of Health, Nos. 98 Civ. 5712 (RMB)(HBP), 99 Civ. 4859 (RMB)(HBP), 2001 U.S. Dist. LEXIS

11287, at *22 (S.D.N.Y. Mar. 21, 2001) ("plaintiff's Human Rights Law claim against the

[Department of Health] and the defendants in their official capacities is barred by the Eleventh

Amendment").

   Because "New York has not waived its immunity from suit, either generally or

specifically, for OMH and Mid-Hudson[,]" Babcock's NYSHRL claims against Defendants

OMH and Mid-Hudson must be dismissed.  Vallen, 2004 U.S. Dist. LEXIS 17573, at *8

(dismissing OMH and Mid-Hudson on Eleventh Amendment immunity grounds) (citing

Greenwood v. State of N.Y., 939 F. Supp. 1060, 1064–65 (S.D.N.Y. 1996), vacated in part on

other grounds, 163 F.3d 119 (2d Cir. 1998) (OMH entitled to Eleventh Amendment immunity)).

Accordingly, OMH and Mid-Hudson are entitled to Eleventh Amendment immunity and to

summary judgment concerning Babcock's NYSHRL claims.[27]

---

[27] Because this Court grants Defendant Holanchock summary judgment on the merits of
Babcock's Title VII and NYSHRL claims, it need not decide whether it can independently
dismiss the NYSHRL claims against Holanchock on the ground that Babcock has failed to
establish Holanchock's personal involvement in the alleged discriminatory or retaliatory acts.
(See Defs. Br. 20–22)

Similarly, because this Court grants Defendants summary judgment on the merits of Babcock's
discrimination and retaliation claims, it need not decide whether Babcock's Title VII claims are
partly time-barred. (See Defs. Br. 22–23; Pltf. Br. 19–20)

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.  The Clerk of the Court is directed to terminate Defendants' motion (Docket No. 39) and to close this case.

Dated: New York, New York
       June 8, 2009

SO ORDERED.

Paul G. Gardephe
United States District Judge